1  CRAIG WILKE (150728)
   craig@craigwilkelaw.com
2  2677 N. Main Street, Suite 830
   Santa Ana, California  92705-6623
3  Telephone (714) 571-0202
   Facsimile  (714) 571-0220
4
   GEORGE L. STEELE (189399)
5  gsteele@glslaw.net
   127 N. Madison Avenue, Suite 24
6  Pasadena, California 91101
   Telephone (626) 405-4860
7  Facsimile  (626) 388-9759

8  Attorneys for Defendant
   LUZ JANET GONZALEZ
9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                  WESTERN DIVISION

13  UNITED STATES OF AMERICA,       )  NO. CR 07-1172(C)-DDP
                                    )
14             Plaintiff,           )  **NOTICE OF MOTION; MOTION
                                    )  TO SUPPRESS EVIDENCE;
15        v.                        )  EXHIBIT A**
                                    )
16  LUZ JANET GONZALEZ              )  Hearing Date: August 15, 2011
                                    )  Hearing Time: 3:00 p.m.
17             Defendant.           )
                                    )
18                                  )
                                    )
19      _____)

20  TO ASSISTANT UNITED STATES ATTORNEYS KEVIN M. LALLY AND NILI

21  T. MOGHADDAM:

22       PLEASE TAKE NOTICE that on Monday, August 15, 2011, at 3:00 p.m., or as

23  soon thereafter as the matter may be heard in the Courtroom of the Honorable Dean

24  D. Pregerson, United States District Judge, Defendant Luz Janet Gonzalez, by and

25  through her attorneys of record Craig Wilke and George L. Steele, will and hereby

26  does move for order suppressing all evidence seized by the government during the

27  search of her residence on or about June 16, 2009, on the ground that the search was

28  /

1    unreasonable in violation of her rights under the Fourth Amendment to the United

2    States Constitution.

3         This motion is brought pursuant to Fed. R. Crim. P. 12(b)(3)(C) and is based

4    on the attached memorandum of points and authorities; Exhibit A attached hereto; the

5    concurrently-filed declarations of Luz Janet Gonzalez and Nancy Cowardin, Ph. D.;

6    the files and records in this case; and any additional evidence and argument that may

7    be presented to the Court at or before the hearing on this motion.

8                            Respectfully Submitted,

9    Dated: June 27, 2011               /s/
10                           CRAIG WILKE
                          Attorney for Defendant
                          Luz Janet Gonzalez

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORTIES

## 1.    INTRODUCTION

Defendant Luz Janet Gonzalez moves to suppress evidence that was seized during a search of her apartment that law enforcement officers conducted without a search warrant.  The government will presumably rely on a "consent to search" form that Ms. Gonzalez signed to justify the warrantless search.  However, Ms. Gonzalez did not read this form before signing it, nobody read it to her, and her mental deficits would preclude her from fully understanding it even if she had read it or it had been read to her.  When Ms. Gonzalez signed the form, she was in custody, had been told that she was charged with murder, and had not been given any *Miranda* warnings or told that she could refuse consent to search the apartment.  She was surrounded by armed law enforcement officers, some of whom had already began searching her apartment.  Her disabled three-year old son had just been forcibly removed from the apartment and she had been falsely accused of using drugs in front of him.  For these reasons, any consent by Ms. Gonzalez to search her apartment was not voluntary.

## 2.    STATEMENT OF FACTS

In June 2009, Ms. Gonzalez was living in a one-room apartment in the area between downtown Los Angeles and MacArthur Park with her disabled three-year old son Frailan whom she supported with disability payments and welfare.  At the time, Ms. Gonzalez was being treated by a doctor for seizures, gallstones and asthma and was taking several different prescription medications.  She was also being treated by a psychiatrist for depression and agitation and was taking anti-depressant medications and anti-anxiety medication daily.  Gonzalez Decl. ¶ 4.

On June 16, 2009, several police officers loudly knocked on the door to Ms. Gonzalez's apartment and ordered her to open the door.  She was feeding Frailan by injecting a syringe of liquid food into the feeding tube that goes directly to his stomach.  She was dressed in underwear and a tank-top.  She had not yet taken her anti-depressant or anti-anxiety medications that morning.  She believed that the

3

police were going to break down the door.  She placed Frailan on the bed, even though he was crying, and answered the door without getting dressed.  *Id*. ¶ 5.

After opening the door, Ms. Gonzalez saw many police officers at the door with guns pointed at her.  The officers entered the apartment, and one of the officers told her that she was under arrest for murder.  Other officers began looking around the apartment with their guns out, and Ms. Gonzalez was taken out to the hallway where she could still hear Frailan crying.  Ms. Gonzalez saw a woman take Frailan out of the apartment.  Ms. Gonzalez asked the officers where they were taking Frailan, and nobody answered her.  When Ms. Gonzalez asked if she could get Frailan's food and medicine for him, she was told "no."  After officers brought Ms. Gonzalez back into the apartment, an officer held up the syringe that she had been using to feed Frailan and accused her of using drugs.  Ms. Gonzalez was allowed to get dressed.  A woman asked Ms. Gonzalez if a family member could take Frailan, and Ms. Gonzalez provided her mother's telephone number.  *Id*. ¶ 6.

One of the officers gave Ms. Gonzalez some papers and told her to sign them.  The officer told Ms. Gonzalez that one of the forms was so they could search the apartment.  Ms. Gonzalez did not read the form.  Nobody read the form to Ms. Gonzalez.  Nobody told Ms. Gonzalez that she could refuse to sign the form.  Ms. Gonzalez thought it was strange that they were asking her to sign the form so they could search the apartment even though they had already searched the apartment when they first came in.  Ms. Gonzalez signed the form and put her initials on it where the officer told me to.  *Id*. ¶ 7; *see also* Exh. A.

Ms. Gonzalez is "borderline" mentally retarded.  Cowardin Decl. ¶¶ 3-4.  She reads individual words and comprehends prose material at a third-grade level. These primer level skills tabulate the mental age equivalent of a child who is eight and one-half years old.  As such, her ability to comprehend text falls in the bottom one percent of persons in her age group.  *Id*. ¶¶ 5-6.  Ms. Gonzalez also has a significant language processing deficit which is consistent with school-based classification as one with a

4

1  severe Learning Handicap.  Her expressive and receptive vocabulary is equivalent to

2  that of a six-to-seven year old and is characterized by difficulty producing answers on

3  demand *and* confusion receiving communicative intent from even simple utterances

4  offered by others.  Her auditory processing is severely impaired, and her ability to

5  process verbal information is equivalent to that of a four and one-half year old child.

6  *Id*. ¶ 7.  The "Consent to Search" form which Ms. Gonzalez signed has a mid-sixth

7  grade readability index and a language age of eleven and one-half years.  Because

8  Ms. Gonzalez reads at a third-grade level, it is unlikely that she would have fully

9  comprehended the nature of the rights she was waiving or the consequences of

10 waiving these rights even if she had attempted to read the form.  Additionally, even if

11 the "Consent to Search" form had been read to her, Ms. Gonzalez's  vocabulary and

12 auditory processing deficits would tend to negate full comprehension of the rights she

13 was waiving and the consequences of waiving them.  *Id*. ¶ 8.

14 **3.    ARGUMENT**

15      "The right of the people to be secure in their persons, houses, papers, and

16 effects, against unreasonable searches and seizures, shall not be violated . . . . "  U.S.

17 Const. amend. IV.  Warrantless searches are "per se unreasonable under the Fourth

18 Amendment - subject only to a few specifically established and well-delineated

19 exceptions."  *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S. Ct. 2408, 57 L. Ed. 2d 290

20 (1978) (citations omitted).  "[T]he voluntary consent of an individual possessing

21 authority" is a recognized exception to the warrant requirement.  *Georgia v.*

22 *Randolph*, 547 U.S. 103. 109, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006) (citation

23 omitted).  However, "the government bears the heavy burden of demonstrating that

24 the consent was freely and voluntarily given." *United States v. Chan-Jimenez*, 125

25 F.3d 1324, 1327 (9th Cir. 1997) (citation omitted).

26      "[W]hether a consent to search was in fact 'voluntary' or was the product of

27 duress or coercion, express or implied, is a question of fact to be determined from the

28 totality of all the circumstances." *Schneckloth v. Bustamante*, 412 U.S. 218, 227, 93

S. Ct. 2041, 36 L. Ed. 2d 854 (1973) (person's knowledge of right to refuse consent is relevant factor but not dispositive on issue of voluntariness).  The following factors are considered in determining whether a consent to search was voluntary:  (1) whether the defendant was in custody; (2) whether the officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.  *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (citation omitted); *Chan-Jimenez*, 125 F.3d at 1327.

Considering these factors, Ms. Gonzalez did not voluntarily consent to the search of her apartment.  She was immediately taken into custody upon opening the door to her apartment while dressed in underwear and a tank top.  She was surrounded by police officers with their guns drawn.  She is borderline mentally retarded and was under psychiatric care at the time but had not yet taken her psychiatric medication that morning. Officers began searching her apartment immediately upon entry and prior to Ms. Gonzalez signing the consent to search form. *See Jones*, 286 F .3d at 1152 (government must prove that prior Fourth Amendment violation did not taint subsequent consent).[1]  Her disabled, three-year old son, whom she had been feeding through a feeding tube when the officers came to her door, was forcibly taken from her apartment.  Ms. Gonzalez was not permitted to get her son's food and medicine, and her question about where he was being taken

---

[1]    In executing an arrest warrant, officers may conduct a protective sweep of "spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).  Once the police look beyond the "immediately adjoining" spaces, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*.  Because a protective sweep is "aimed at protecting the arresting officers," it is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id*. at 335 (footnote omitted); *United States v. Furrow*, 229 F.3d 805, 811-12 (9th Cir. 2000) (purpose of protective sweep is to protect officers against surprise attack by unknown others and is narrowly confined to a cursory visual inspection of potential hiding places).

1  went unanswered. *See United States v. Patayan Soriano*, 361 F .3d 494, 502 (9th Cir.

2  2004) ("consent could properly be set aside as involuntary" based on "unabated"

3  threat to take person's children away).  Ms. Gonzalez was not given any *Miranda*

4  warnings prior to the signing the consent to search form, and she was not told that

5  she had the right to refuse consent.  *See United States v. Reid*, 226 F.3d 1020, 1026-

6  27 (9th Cir. 2000) (consent to search apartment not voluntary where person was

7  frisked and handcuffed by armed officers and not informed of *Miranda* rights or right

8  to refuse consent); *Chan-Jimenez*, 125 F.3d at 1327 (consent to search truck was not

9  voluntary where defendant had been seized, not given *Miranda* warnings, not told of

10  his right to refuse consent, and officer kept hand on gun).  Ms. Gonzalez did not read

11  the consent to search form and nobody read it to her before she signed it.  Moreover,

12  even if she had attempted to read the form before signing it or somebody had read it

13  to her, it is unlikely that Ms. Gonzalez would have fully comprehended the nature of

14  the rights she was waiving or the consequences of waiving these rights given her

15  significant reading, vocabulary and auditory processing deficits.  *See United States v.*

16  *Higareda-Santa Cruz*, 826 F. Supp. 355, 359 (D. Or. 1993) (court may consider

17  expert testimony regarding a defendant's inability to understand consent to search);

18  *cf. United States v. Garibay*, 143 F .3d 534, 537-39 (9th Cir. 1998) (relying on expert

19  testimony in concluding that *Miranda* waiver was not knowing and intelligent).

20  **4.      CONCLUSION**

21          For all of the foregoing reasons, the Court should suppress all evidence seized

22  by the government during the search of Ms. Gonzalez's residence.

23                                                    Respectfully Submitted,

24  Dated: June 27, 2011                        /s/
                                                    CRAIG WILKE
25                                                  Attorney for Defendant
                                                    Luz Janet Gonzalez
26

27

28

7