CRAIG WILKE (150728)
craig@craigwilkelaw.com
2677 N. Main Street, Suite 830
Santa Ana, California 92705-6623
Telephone (714) 571-0202
Facsimile (714) 571-0220

GEORGE L. STEELE (189399)
gsteele@glslaw.net
127 N. Madison Avenue, Suite 24
Pasadena, California 91101
Telephone (626) 405-4860
Facsimile (626) 388-9759

Attorneys for Defendant
LUZ JANET GONZALEZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LUZ JANET GONZALEZ<br><br>Defendant. | NO. CR 07-1172(C)-DDP<br><br>**NOTICE OF MOTION AND MOTION TO SUPPRESS DEFENDANT'S POST-ARREST STATEMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CRAIG WILKE; EXHIBITS A-C**<br><br>Hearing Date: August 15, 2011<br>Hearing Time: 3:00 p.m. |

TO ASSISTANT UNITED STATES ATTORNEYS KEVIN M. LALLY AND NILI T. MOGHADDAM:

PLEASE TAKE NOTICE that on Monday, August 15, 2011, at 3:00 p.m., or as soon thereafter as the matter may be heard in the Courtroom of the Honorable Dean D. Pregerson, United States District Judge, Defendant Luz Janet Gonzalez, by and through her attorneys of record Craig Wilke and George L. Steele, will and hereby does move for an order suppressing her post-arrest statement on the grounds that (1) she did not knowingly and intelligently waive her *Miranda* rights, and (2) her statement was not voluntary.

1    This motion is brought pursuant to Fed. R. Crim. P. 12(b)(3) and is based on

2   the attached memorandum of points and authorities and Declaration of Craig Wilke,

3   Exhibit A which is the video recording of Ms. Gonzalez's post-arrest statement that

4   has been lodged with the Court, Exhibits B attached hereto which is a transcript of

5   the video recording, C attached hereto which is the "advice of rights" form, the

6   declarations of Luz Janet Gonzalez and Nancy Cowardin that have been filed

7   concurrently, the files and records in this case, and any additional evidence and

8   argument that may be presented to the Court at or before the hearing on this motion.

9                                          Respectfully Submitted,

10  Dated: June 27, 2011              _____
                                              /s/
11                                     CRAIG WILKE
                                       Attorney for Defendant
12                                     Luz Janet Gonzalez

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

1.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

2.    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

3.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

      3.1.   The Court Should Suppress Ms. Gonzalez's
             Post-Arrest Statement Because She Did Not
             Knowingly and Intelligently Waive Her *Miranda*
             Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

      3.2.   The Court Should Suppress Ms. Gonzalez's
             Post-Arrest Statement Because It Was Not Voluntary. . . . . . . . . . . . . .  12

4.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

i

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Arizona v. Fulminante,*
   111 S. Ct. 1246, 111 S. Ct. 1246, 113 L. Ed. 2d 302  (1991).. . . . . . . . . . . . . 12

4

5

*Blackburn v. Alabama,*
   361 U.S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960) .. . . . . . . . . . . . . . . . . . 12

6

*Colorado v. Connelly,*
   479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). . . . . . . . . . . . . . . . . 12

7

8

*Davis v. North Carolina,*
   384 U.S. 737, 86 S. Ct. 1761, 16 L. Ed. 2d 895 (1966). . . . . . . . . . . . . . . . . 12

9

*Haynes v. Washington,*
   373 U.S. 503, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963). . . . . . . . . . . . . . . . . 12

10

11

*Hutto v. Ross,*
   429 U.S. 28, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976) .. . . . . . . . . . . . . . . . . . 12

12

*Lego v. Twomey,*
   404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618  (1972).. . . . . . . . . . . . . . . . . 13

13

14

*Mincey v. Arizona,*
   437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). . . . . . . . . . . . . . . . . 12

15

*Miranda v. Arizona,*
   384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). . . . . . .   3, 6, 8, 9-11, 14

16

17

*Moran v. Burbine,*
   475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). . . . . . . . . . . . . . . . 9

18

*North Carolina v. Butler,*
   441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). . . . . . . . . . . . . . . . . 9

19

20

*Schneckloth v. Bustamonte,*
   412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). . . . . . . . . . . . . . . . . 12

21

*Townsend v. Sain,*
   372 U.S. 293, 83 S. Ct. 745, 9 L. Ed 2d 770 (1963).. . . . . . . . . . . . . . . . . . . 13

22

23

*United States v. Garibay,*
   143 F.3d 534 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11

24

*United States v. Rodriguiez-Gastelum,*
   569 F.2d 482 (9th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25

26

*United States v. Tingle,*
   658 F.2d 1332 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

27

**Other Authorities**

28

18 U.S.C. §3501(b)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1.    INTRODUCTION

Defendant Luz Janet Gonzalez is borderline mentally retarded.  She reads at a third grade level and has the ability to process verbal information as that of a four and one-half year old child.  On June 16, 2009, she was under psychiatric treatment but had not taken her anti-depressant or anti-anxiety medication that day.  After being told she was charged with murder, her son was forcibly removed from her.  She was falsely accused of using drugs in front of her son, told that she would not see him again, told she was facing life imprisonment and would not see her son again if she did not cooperate, and told that other murders could be pinned on her if she did not provide information about the murder of the baby for which she was arrested. Thereafter, she was read her *Miranda* rights, which her mental deficits precluded her from fully comprehended, and signed a waiver after officers misleadingly told her that she was signing "for [her] rights" and "not . . . anything else."  Officers interrogated Ms. Gonzalez for more than two hours, repeatedly coercing her into making statements by reminding her of her relationship with her son, misrepsenting the evidence against her, and threatening to withhold their assistance unless she incriminated herself.  While Ms. Gonzalez did not confess to participating the events leading to the murder of the baby, she made marginally incriminating statements concerning her association with the persons responsible for the killing and her knowledge of their intentions and activities.  These statements should be suppressed because Ms. Gonzalez did not knowingly and intelligently waive her *Miranda* rights, and her statements were not voluntary.

### 2.    STATEMENT OF FACTS

At the time of her arrest in June 2009, Luz Janet Gonzalez was thirty-two years old.  She grew up in Los Angeles in the area between downtown and MacArthur Park and had lived in this area her entire life when she was otherwise not incarcerated. She attended special education in elementary school and stopped attending school in

3

the seventh grade at age twelve or thirteen.[1]  When she was eleven years old, she ran away from home because her step-father physically and sexually abused her.  She began living with friends on the street.  She had a head injury at or about age thirteen after being hit by a car, and a second head injury at or about age sixteen after being assaulted.  She has had seizures since age twelve or thirteen.  Gonzalez Decl. ¶ 2.

After she had a miscarriage at age sixteen, Ms. Gonzalez believed that she could not have a child.  Nonetheless, in February 2006, when Ms. Gonzalez was twenty-eight years old, she gave birth to her son Frailan.  Frailan was born two-months premature and severely disabled.  He has Silver-Russell Syndrome which is a condition that affects his growth and makes him very small for his age.  He can not eat regular food and has to be fed with liquid injected with a syringe into a feeding tube that goes to his stomach.  Ms. Gonzalez raised Frailan on her own until she was arrested.  *Id*. ¶ 3.

In June 2009, Ms. Gonzalez was living in a one-room apartment in the area between downtown Los Angeles and MacArthur Park with Frailan whom she supported with disability payments and welfare.  At the time, Frailan was taking antibiotics for a respiratory infection and asthma medication.  Ms. Gonzalez was being treated by a doctor for seizures, gallstones and asthma and was taking several different prescription medications.  She was also being treated by a psychiatrist for depression and episodes of agitation and was taking anti-depressant medications and anti-anxiety medication daily.  *Id*. ¶ 4.

On the morning of her arrest (*i.e.,* June 16, 2009), several police officers loudly knocked on the door and ordered Ms. Gonzalez to open the door.  Ms. Gonzalez was feeding Frailan by injecting a syringe of liquid food into the feeding tube that goes directly to his stomach.  Ms. Gonzalez was dressed in underwear and a tank-top.  Ms. Gonzalez had not yet taken her anti-depressant or anti-anxiety medications that

_____

[1]    Ms. Gonzalez had no other education until age twenty-five (*i.e.,* approximately 2002) when she went to culinary arts classes.  Gonzalez Decl. ¶ 2.

4

morning.  Ms. Gonzalez believed that the police were going to break down the door.
She placed Frailan on the bed, even though he was crying, and answered the door
without getting dressed.  *Id*. ¶ 5.

After opening the door, Ms. Gonzalez saw many police officers at the door
with guns pointed at her.  The officers entered the apartment, and one of the officers
told Ms. Gonzalez that she was under arrest for murder.  Other officers began looking
around the apartment with their guns out, and Ms. Gonzalez was taken out to the
hallway where she could still hear Frailan crying.  Ms. Gonzalez saw a woman take
Frailan out of the apartment.  Ms. Gonzalez asked the officers where they were taking
Frailan, and nobody answered her.  When Ms. Gonzalez asked if she could get
Frailan's food and medicine for him, she was told "no."  After officers brought Ms.
Gonzalez back into the apartment, an officer held up the syringe that Ms. Gonzalez
had been using to feed Frailan and accused her of using drugs.  Ms. Gonzalez was
permitted to get dressed.  A woman asked Ms. Gonzalez if a family member could
take Frailan, and Ms. Gonzalez provided her mother's telephone number.  *Id*. ¶ 6.

As officers were taking Ms. Gonzalez outside and putting her in a car, she
asked where her baby was.  One of the officers said that she was not going to see him
again.  Detective Holmes and another officer drove her to a police station (*i.e.*, FBI
office in West Los Angeles).  While driving to the police station, Ms. Gonzalez asked
where they took Frailan.  Detective Holmes told Ms. Gonzalez that they were taking
Frailan to Ms. Gonzalez's mother.  Ms. Gonzalez told Detective Holmes that her
baby needed special care.  *Id*. ¶ 8.

Ms. Gonzalez was transported to the FBI office in West Los Angeles.  *See* Exh.
B at 1.  At the FBI office, Ms. Gonzalez was put in an office which was not the same
room in which her video-recorded statement was taken.  Detective Holmes told Ms.
Gonzalez that she was charged with the murder of a baby.  She told him that she did
not have anything to do with the murder of a baby.  Detective Holmes told her that
her "homeboys" were "snitching" on her.  He said that he already knew the "truth"

1   that she had something to do with the killing of the baby.  He pointed to a stack of

2   files on the desk and said the files were all murders.  He told Ms. Gonzalez that, if

3   she did not tell him about the murder of the baby, he could "pin" more murders on

4   me.  He told Ms. Gonzalez that she was going to get a life sentence and would not see

5   her son again unless she cooperated.  Gonzalez Decl. ¶ 9.

6          After placing Ms. Gonzales in another room, Detective Holmes began the

7   video-taped interrogation.  *See* Exh. A (video recording).  Detective Oppelt was also

8   present.  Detective Holmes began by telling Ms. Gonzalez "[b]efore we ask you any

9   questions, you must understand you rights" and then immediately read a *Miranda*

10  advisement to her.  Exh. B at 4 (transcript of video recording).  The following

11  colloquy then took place:

12          Holmes:      Does that make sense to you?  At any time you can say, hey

13                       I'm done.  I don't want to talk to you.  You're making me

14                       mad or whatever, and, and we're done.  Okay?  You get to

15                       control that.  Okay?

16          JG:          No.  It's just that I have, I've just got hard, hard to um, hard

17                       to talk.  I stutter a lot.

18          Holmes:      That's fine.  That's fine.

19          Oppelt:      Just take your time.  Take your time.  We, [w]e're not in any rush.

20          Holmes:      Yeah.  Um, okay, and then, just right here, your statement right

21                       here, "I have read this statement about my rights.  I understand

22                       what my rights are at this time.  I am willing to answer questions

23                       without a lawyer present," and that you need to sign right here and

24                       then I'll sign right here and date.

25          Gonzalez:    This is just for my rights, right?

26          Holmes:      Yep!

27          Oppelt:      Yeah.  You're not signing anything else.

28  Exh. B at 4-5.  Ms. Gonzalez then signed a *Miranda* "advice of rights" form.  *See*

6

Exh. C (advice of rights form).  The form states that "I have read this statement of rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  *Id*.  Ms. Gonzalez did not read this form before signing it.  Gonzalez Decl. ¶ 10.

For more than two hours, Detectives Holmes and Oppelt interrogated Ms. Gonzalez.  Throughout the interrogation, Detective Holmes repeatedly told Ms. Gonzalez that he already knew everything from talking to others who were involved.  Exh. B at 5, 11, 33-34.  Detective Holmes misled Ms. Gonzalez about the evidence against her by telling her that he had wiretap evidence, that he had her "own voice on the recording," that he had evidence of a conversation between Ms. Gonzalez and a vendor on the day following the killing showing she knew of the plan to assault the vendor, and that he had cell tower records showing that she went back to South Gate after the shooting, *id*. at 6, 33, 36, 40, even though no such evidence exists.  Wilke Decl. ¶ 2.  Detective Holmes told Ms. Gonzalez about how she needed to think about her son.  *Id*. at 12-14.  When Ms. Gonzalez made exculpatory statements about her lack of knowledge of a plan to assault the vendor, Detective Holmes accused her of not being truthful, and told her that he "can't do anything for" her if she persisted in making such statements.  *Id*. at 33-34.

During the course of the interrogation, Ms. Gonzalez made several incriminating statements.  She stated that she had been a member of the 18th Street gang since age eight.  *Id*. at 7-8.  She also stated that she had sold rock cocaine, but did so only to support herself and not for the gang.  *Id*. at 8-9, 16-18.  During questioning about the killing of the baby, Ms. Gonzalez admitted to riding in a truck with Face (Juan Pablo Murillo), Rusty (Giovanni Velasquez), Silly (Ralph Santiago), Shorty (Jenny Alas) and Crow (James Wooten) from a South Gate residence to Fifth and Burlington in Los Angeles where Face and Rusty got out, that she heard gunshots shortly thereafter, and that Rusty returned to the truck and they drove back to South Gate.  *Id*. at 56, 59.  Ms. Gonzalez repeatedly denied having prior

knowledge of Face and Rusty's intentions. *Id*. at 4-5, 7, 32-36, 41-42, 45, 52-53. After Detective Holmes accused her of being untruthful, told her that he "can't do anything for" her if she persisted in making such statements, and brought up her relationship with her son Frailan and how she needed to think about him, Ms. Gonzalez stated that she had overheard a conversation in which Face said a "guy"had "got crazy" with him and was not going to pay, *id*. at 43-44, 50-52, that she tried to discourage him from doing anything by telling him that he "always has problems getting crazy with innocent people," *id*. at 74-75, and that she knew when she rode in the truck that something was going to happen and that Face was going to confront the vendor, *id*. at 54-55, 74.

Ms. Gonzalez is "borderline" mentally retarded. Cowardin Decl. ¶¶ 3-4. She reads at a third-grade level, or the equivalent to the average eight and one-half year old, which also places her within the bottom one-percent of persons in her age group.[2] *Id*. ¶¶ 5-6. Her expressive and receptive vocabulary is equivalent to a six-to-seven year old and is characterized by difficulty producing answers on demand *and* confusion receiving communicative intent from even simple utterances offered by others. *Id*. ¶ 7. Her auditory processing is severely impaired, and she processes verbal information equivalent to a four and one-half year old child. *Id*. The "Advice of Rights" form that Ms. Gonzalez signed has a seventh grade readability index and a language age of twelve to thirteen years. *Id.* ¶ 9. Ms. Gonzalez's six to seven year age score for single word vocabulary and four and one-half year age score for auditory processing would tend to negate full comprehension of her *Miranda* rights and the consequences of waiving them. *Id*. Detective Holmes' multiple, run-on utterances in reading Ms. Gonzalez her *Miranda* rights would present additional

_____

[2]      Dr. Nancy Cowardin determined Ms. Gonzalez's IQ as well as her reading and comprehension ability based on testing she performed in or about October 2010, approximately sixteen months after Ms. Gonzalez's arrest. Cowardin Decl. ¶ 2. Dr. Cowardin's results are corroborated by an independent psychological evaluation of Ms. Gonzalez conducted by Thomas Carrillo, Ph.D. in or about October 2008, approximately eight months before Ms. Gonzalez's arrest. *Id*. ¶¶ 4, 6.

difficulties for Ms. Gonzalez.  *Id*.  Under such circumstances, persons with Ms. Gonzalez's impairment tend to feign comprehension rather than disclose their deficits to others.  *Id*.  It is unlikely that Ms. Gonzalez would interpret more than the gist of Detective Holmes' oral *Miranda* advisement due to her ongoing processing imprecision.  *Id*.  Moreover, because Ms. Gonzalez reads at a third-grade level, she could not fully comprehend the *Miranda* advisement even if she had attempted to read the form.  *Id*.

**3.    ARGUMENT**

> **3.1.    The Court Should Suppress Ms. Gonzalez's Post-Arrest Statement Because She Did Not Knowingly and Intelligently Waive Her *Miranda* Rights**

"[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived [her] privilege against self-incrimination and [her] right to retained or appointed counsel."  *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  In order to use Ms. Gonzalez's statement against her, the government must demonstrate that the defendant's waiver of her rights was made with a full awareness, both of the nature of the right to be abandon and consequences of the decision to abandon it.  *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986).  "The government's burden to make such a showing 'is great,' and the court [must] 'indulge every reasonable presumption against waiver of fundamental constitutional rights.'"  *United States v. Garibay*, 143 F.3d 534, 537 (9th Cir. 1998) (citations omitted).  The court must consider the "totality of the circumstances surrounding the interrogation," including Ms. Gonzalez's background, experience and conduct, in determining whether any waiver of her rights was knowing and intelligent.  *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979).

In *Garibay*, the Ninth Circuit held that the district court's finding that the defendant knowingly and intelligently waived his *Miranda* rights was clearly

9

erroneous.  *Garibay*, 143 F.3d at 536-39.  The defendant in *Garibay* answered "yes"
when the agent asked him if he understood English.  *Id*. at 536.  The agent then orally
read the defendant his *Miranda* rights, and the defendant indicated that he
understood.  *Id*.  Thereafter, the defendant made incriminating statements in response
to interrogation.  *Id*.  The defendant moved to suppress the statements on the ground
that he did not understand the nature of the rights he was waiving because of his
limited English skills and low mental capacity.  *Id*.  The district court denied the
motion, find the defendant's waiver to be knowing and intelligent.  *Id*.  In reversing,
the Ninth Circuit considered the defendant's language difficulties as a factor and did
not find the defendant's acknowledgment that he understood English to be
dispositive where the defendant introduced evidence that he often claimed to
understand English when interacting with persons of authority when, in fact, he did
not understand what was being said to him.  *Id*. at 537-39.  The Ninth Circuit also
recognized that "[a] defendant's mental capacity directly bears upon the question of
whether he understood the meaning of his *Miranda* rights and the significance of
waiving his constitutional rights."  *Id*. at 538 (citations omitted).  Noting that the
defendant was borderline mentally retarded and his English verbal comprehension
was below four, *id*. at 538 n.6, the court held that, without the ability to understand
oral instructions, the defendant "could not have knowingly and intelligently waived
his rights."  *Id*. at 538.

        The evidence of a lack of a knowing and intelligent waiver of *Miranda* rights
is even more compelling in this case than in *Garibay*.  Ms. Gonzalez was under
psychiatric treatment at the time for both depression and anxiety and had not received
her anti-depressant or anti-anxiety medication that morning, yet the circumstances
preceding her interrogation were highly stressful.  She had been arrested at gunpoint
in her home, told she was charged with murder, forcibly removed from her disabled
three-year old son, and told that she was not going to see her child again.  Prior to the
interrogation, she was told that she was charged with the murder of a baby and that

she could be charged with other murders if she did not cooperate concerning the murder of the baby.  She was also told that others were already "snitching" on her and that she was going to get a life sentence and would not see her son again.

Like the defendant in *Garibay*, Ms. Gonzalez is borderline mentally retarded and lacks the ability to understand an verbal *Miranda* advisement.  She has the vocabulary of a six to seven year old and the ability to process verbal information of a four and one-half year old, whereas the language age for a *Miranda* advisement is twelve to thirteen years old.  While the defendant in *Garibay* expressly acknowledged that he understood his rights, Ms. Gonzalez responded "no" when Detective Holmes asked her if his reading of the *Miranda* rights "ma[d]e sense" to her.  Based on Ms. Gonzalez's substantial deficits in vocabulary and auditory processing, it is unlikely that she interpreted any more than the gist of Detective Holmes' oral *Miranda* advisement.  She signed a written *Miranda* advisement and waiver without reading it[3] and only after being misleadingly assured that she was signing "for [her] rights" and "not signing anything else."  The fact that her mental deficits make her likely to feign comprehension rather than disclose her deficit explain why she proceeded to answer Detective Holmes' questions without knowingly and intelligently waiving her rights.  During the interrogation, she was reminded of her relationship with her son and told by Detective Holmes that he could not help her if she persisted in denying inculpatory knowledge.  Finally, there is no evidence that Ms. Gonzalez had any understanding from her prior experience in the criminal justice system of the nature of her *Miranda* rights or the consequences of waiving them.  For these reasons, Ms. Gonzalez did not have a "full awareness" of the nature of her rights or the consequences of waiving them and, therefore, did not

/

---

[3]     Given that Ms. Gonzalez reads at a third-grade level, or the equivalent to the average eight and one-half year old, she could not have fully understood the *Miranda* advisement even if she had read it.

1  knowingly and intelligently waive her right to remain silent or her right to counsel

2  prior to the custodial interrogation which led to her post-arrest statements.

3      **3.2.**   **The Court Should Suppress Ms. Gonzalez's Post-Arrest Statement**

4                **Because It Was Not Voluntary**

5        Involuntary statements are not admissible for any purpose. *Mincey v. Arizona*,

6  437 U.S. 385, 398, 98 S. Ct. 2408, 2416, 57 L. Ed. 2d 290 (1978). For a statement to

7  be voluntary, it must be the product of rational intellect and free will. *Townsend v.*

8  *Sain*, 372 U.S. 293, 307-08, 83 S. Ct. 745, 9 L. Ed 2d 770 (1963). A statement is

9  involuntary when the government obtains it by psychological coercion or by improper

10  influence so the suspect's will is overborne. *Haynes v. Washington*, 373 U.S. 503,

11  513-14, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963); *see also Hutto v. Ross*, 429 U.S. 28,

12  30, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976) (statement is involuntary if it is "obtained

13  by any direct or implied promises, however slight, [or] by the exertion of any

14  improper influence"). While "coercive police activity is a necessary predicate to the

15  finding that a confession is not 'voluntary' within the meaning of the Due Process

16  Clause," *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473

17  (1986), "a finding of coercion need not depend upon actual violence by a government

18  agent." *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S. Ct. 1246, 113 L. Ed. 2d 302

19  (1991); *see also Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S. Ct. 274, 4 L. Ed. 2d

20  242 (1960) ("coercion can be mental as well as physical").

21        In determining whether a statement is voluntary, a court must consider the

22  totality of the circumstances surrounding the taking of the statement and their affect

23  on the individual defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27, 93 S.

24  Ct. 2041, 36 L. Ed. 2d 854 (1973). Factors to be considered in assessing the

25  voluntariness of a statement include the defendant's background, experience and

26  conduct, *Davis v. North Carolina*, 384 U.S. 737, 741-42, 86 S. Ct. 1761, 16 L. Ed. 2d

27  895 (1966); *United States v. Rodriguiez-Gastelum*, 569 F.2d 482, 488 (9th Cir. 1978);

28  the defendant's mental status at time of the interrogation, *Blackburn*, 361 U.S. at 199

(1960), and the fact that a defendant was without the assistance of counsel at the time of the statement, 18 U.S.C. § 3501(b)(5). The government has the burden to establish, by a preponderance of the evidence, that the statement is voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972).

In *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), the Ninth Circuit held that a defendant's statement to a FBI agent concerning her involvement in a bank larceny was involuntary even though the defendant read an advice of rights form aloud, indicated that she understood her rights and was willing to answer questions, and signed a written waiver. *Id*. at 1333. In finding the defendant's statement to be involuntary, the Ninth Circuit noted that the agent accused the defendant of lying, explained the advantages of cooperating, told her she faced up to forty years imprisonment, suggested to her that her boyfriend had already implicated her in the crime, and told her that she would or might not see her child for a while if she went to prison. *Id*. at 1333-34. Recognizing that a confession may be "coerced by psychological pressure," *id*. at 1335 (citing *Townsend v. Sain*, 372 U.S. 293, 307, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963)), the Ninth Circuit held that the agent's "purpose and objective of the interrogation was to cause [the defendant] to fear that, if she failed to cooperate, she would not see her young child for a long time" and "such would be the conclusion which [the defendant] could reasonably be expected to draw from the agent's use of this technique." *Id*. at 1336. "When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert the 'improper influence' proscribed by" controlling Supreme Court authority. *Id*. The Court found that the agent's statements when "read together, as they were intended to be, and as they would reasonably be understood" were "patently coercive" and thereby rendered the defendant's statement involuntary. *Id*.

Like *Tingle*, the circumstances surrounding Ms. Gonzalez's interrogation were patently coercive. She was arrested in her home at gunpoint, dressed only in her

13

1   underwear and a tank-top, in front of her disabled three-year old son whom she had

2   been feeding through his feeding tube when the police came to her door demanding

3   entry.  Her son was immediately taken from her, and she was falsely accused on using

4   drugs in his presence.  She was told that she was charged with murder.

5          Between the time of her arrest and the beginning of the interrogation, she was

6   told three times by two different law enforcement officers, including Detective

7   Holmes, that she would not see her son again.  Detective Holmes specifically told her

8   that she was facing life in prison and would not see her son again if she did not

9   cooperate.  He also told her that he had several murders that he could "pin" on her if

10  she did not tell him about the murder of the baby.

11         Once the police began the video recording, Detective Holmes told Ms.

12  Gonzalez that she "need[ed]" to sign the *Miranda* waiver (which she did not read),

13  and Detective Holmes and Detective Oppelt misleadingly advised her that she was

14  signing "for [her] rights."  Throughout the course of the interrogation, Detective

15  Holmes repeatedly told Ms. Gonzalez that he already knew everything from talking to

16  others who were involved, that he had wiretap evidence, that he had her "own voice

17  on the recording," and that he had evidence of a conversation between Ms. Gonzalez

18  and a vendor on the day following the killing showing she knew of the plan to assault

19  the vendor.  Detective Holmes told Ms. Gonzalez about how she needed to think

20  about her son, and, when Ms. Gonzalez made exculpatory statements about her lack

21  of knowledge of a plan to assault the vendor, Detective Holmes accused her of not

22  being truthful, and told her that he "can't do anything for" her if she persisted in

23  making such statements.

24         The totality of these circumstances are as, if not more, coercive than the

25  circumstances in *Tingle.*  Detective Holmes deliberately preyed on Ms. Gonzalez's

26  maternal instinct and instilled fear that she would not see her son again in order to

27  elicit her cooperation.  Ms. Gonzalez was particularly susceptible to such

28  psychological coercion given that was receiving psychiatric treatment for depression

and anxiety but had not received her psychiatric medication that morning.  Ms. Gonzalez was also particularly susceptible to Detective Holmes' psychological coercion because she processes verbal information equivalent to a four-year old child. For all of these reasons, Ms. Gonzalez's post-arrest statement was involuntary.

**4.    CONCLUSION**

For the reasons stated in Section 3.1, the Court should suppress Ms. Gonzalez's post-arrest statement for purposes of the government's case-in-chief at trial.  For the reasons stated in Section 3.2, the Court should suppress Ms. Gonzalez's post-arrest statement for all purposes.

Respectfully Submitted,

Dated: June 27, 2011

_____/s/_____

CRAIGWILKE
Attorney for Defendant
Luz Janet Gonzalez

## DECLARATION OF CRAIG WILKE

I, Craig Wilke, hereby state and declare the following:

I am an attorney licensed to practice law in the State of California and admitted to practice law in the Central District of California.  I have been appointed to represent Luz Janet Gonzalez.

1.      Ms. Gonzalez is charged in Count Fifteen of the Third Superseding Indictment with aiding and abetting the murder of L.A.G. for the purpose of maintaining and increasing her position in a racketeering enterprise.

2.      Based on my understanding of the case from reviewing the discovery and speaking to government counsel, I understand that the victim was a three-week old infant whom Giovanni Macedo accidentally shot and killed while attempting to murder to F.C.  This incident occurred on September 15, 2007.

3.      I am familiar with the discovery, yet I am unaware of any wiretap evidence implicating Ms. Gonzalez in the alleged murder of L.A.G.; any evidence of a conversation between Ms. Gonzalez and a vendor on or about September 16, 2007, (the day after the alleged murder of L.A.G.) showing that Ms. Gonzalez knew of the plan to assault F.C.; or any evidence of cell tower records showing that Ms. Gonzalez went back to South Gate after the shooting.  I requested government counsel to clarify whether this evidence exists.  On June 27, 2011, Assistant United States Attorney Nili Moghaddam advised me that the government is unaware of any such evidence but is awaiting confirmation from law enforcement agencies involved in the investigation of this case before it can definitively represent that no such evidence exists.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 27th day of June 2011, at Santa Ana, California.

_____/s/_____
CRAIG WILKE

16